UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:05-cv-1517-TWP-DML |
| | ) | |
| JAMES G. COLVIN, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON MOTION FOR RELIEF PURSUANT TO
28 U.S.C. § 2255 AND DENYING CERTIFICATE OF APPEALABILITY**

For the reasons explained in this Entry, the Motion of James Colvin ("Colvin") for relief pursuant to 28 U.S.C. § 2255 must be denied and the action dismissed with prejudice. In addition, the court finds that a certificate of appealability should not issue.

**I. The § 2255 Motion**

**A. Background**

A jury found the following: in the early morning hours of October 7, 1996, Colvin and two confederates burned a wooden cross in the front yard of Mr. Ortiz ("Ortiz"), an individual of Puerto Rican heritage whom Colvin believed was a rival for the affections of a mutual friend. During the cross-burning, Colvin carried a semi-automatic assault rifle. Colvin's offenses for this conduct violated the following statutes: (1) 18 U.S.C. § 241 (conspiracy against the civil rights of citizens); (2) 42 U.S.C. § 3631(a) and 18 U.S.C. § 2 (violation of civil rights by use of fire and aiding and abetting); (3) 18 U.S.C. §§ 844(h)(1) and 2 (felony offense by use of fire/explosive and aiding and abetting); and (4) 18 U.S.C. § 924(c)) and 2 (use of fire in relation to a crime against the rights of citizens and aiding and abetting).

1

Colvin's conviction was affirmed on appeal in *United States v. Colvin*, 276 F.3d 945 (7th Cir. 2002). That opinion was vacated and replaced by the *en banc* decision in *United States v. Colvin*, 353 F.3d 569 (7th Cir. 2003). Colvin now seeks relief pursuant to 28 U.S.C. § 2255, a Motion to Vacate, Set Aside or Correct Sentence by a Person in Federal Prison. Colvin argues that he was denied the effective assistance of counsel because of his attorneys' unreasonable failure to investigate the availability of alibi witnesses,[1] and interview certain Government witnesses.

**B. Applicable Law**

A motion pursuant to 28 U.S.C. § 2255 is the presumptive means by which a federal prisoner can challenge his conviction or sentence. *See Davis v. United States*, 417 U.S. 333, 343 (1974). This statute provides for collateral relief from a federal conviction or sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). The scope of relief available under § 2255 is narrow, limited to "an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Borre v. United States*, 940 F.2d 215, 217 (7th Cir. 1991) (internal citations omitted).

A claim of ineffective assistance of counsel is an exception to the rule of procedural default and generally may be raised during a collateral challenge. *See Massaro v. United States,* 538 U.S. 500 (2003). The right to the effective assistance of counsel is denied when the performance of counsel falls below an objective standard of reasonable professional conduct and

---

[1] A second claim in the § 2255 motion has been withdrawn.

thereby prejudices the defense. *Yarborough v. Gentry,* 540 U.S. 1, 5 (2003) (citing *Strickland v. Washington,* 466 U.S. 668, 688-94 (1984)). For a petitioner to establish that his "counsel's assistance was so defective as to require reversal" of a conviction or a sentence, he must make two showings: (1) deficient performance that (2) prejudiced his defense. *Strickland,* 466 U.S. at 687. With respect to the first prong, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith,* 539 U.S. 510, 521 (2003) (quoting *Strickland,* 466 U.S. at 688). With respect to the prejudice requirement, it must be shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. It is not enough for a petitioner to show that "the errors had some conceivable effect on the outcome of the proceeding." *Strickland,* 466 U.S. at 693. A petitioner must specifically explain how the outcome at trial would have been different absent counsel's ineffective assistance. *Berkey v. United States,* 318 F. 3d 768, 773 (7th Cir. 2003). "Unless a defendant makes both showings, it cannot be said that the conviction…resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. 687.

In the particular setting presented here, to show prejudice from an alleged failure to investigate potential alibi witnesses Colvin must show with specificity what the investigation would have revealed and how it would have altered the outcome of the proceedings. *United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir. 1987) ("When the allegation of the ineffectiveness of counsel centers on a supposed failure to investigate, we cannot see how…the petitioner's obligation can be met without a comprehensive showing as to what the investigation would have produced."). "[S]trategic choices made after thorough investigation of

3

law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91.

**C. Analysis**

Colvin's defense at trial was built on the premise that he was not involved in the cross-burning and that he had not sought approval from the Ku Klux Klan ("KKK") to conduct it. He argues that his trial attorneys failed to interview and present witnesses whose testimony would have supported this defense and contradicted the testimony of the prosecution's witnesses. He concludes that the failure to interview and present these witnesses amounted to deficient performance that prejudiced his defense, as *Strickland* requires.

*The Testimony at Trial*. At trial, Colvin's two accomplices, Travis Funke ("Funke") and Lee Mathis ("Mathis"), as well as Kyle Stacey ("Stacey"), testified as to Colvin's role in the cross-burning which occurred on October 7, 1996. Stacey assisted Funke in burning a cross a week earlier but was not a participant in the October 7, 1996 cross-burning. The government's case against Colvin rested principally on the direct testimony of Funke, Mathis, and Stacey.

The testimony of Funke, Mathis, and Stacey amply supported the jury's conclusion that Colvin participated in the cross-burning. The testimony was that Funke and Colvin joined the KKK in the summer of 1996 [Trial Tr. 35-36; Funke testimony]. Funke burned a cross with Stacey on September 30, 1996 and when he told Colvin about it, the two of them decided to burn a cross. [Trial Tr. 46, 49; Funke testimony]. Colvin obtained permission to do so from the Imperial Wizard of the KKK. [Trial Tr. 49; Funke testimony]. It was Funke's understanding that they chose the house to burn the cross in front of because Colvin's ex-girlfriend was dating the owner. [Trial Tr. 50-51; Funke testimony]. On October 6, 1996, Funke, Colvin, and Mathis were at Colvin's home discussing burning a cross. Funke and Colvin informed Mathis that he had to

participate. [Trial Tr. 51-52; Funke testimony; Trial Tr. 105 Mathis testimony]. Colvin stated he knew where they could go to burn a cross. [Trial Tr. 106; Mathis testimony].

Colvin, Funke, and Mathis built the cross at Colvin's house, wrapped it in old sheets and soaked it in gas and oil. [Trial Tr. 53; Funke testimony; Trial Tr. 107; Mathis testimony]. They proceeded to douse it with kerosene over the course of about an hour. [Trial Tr. 108; Mathis testimony]. Then they loaded the cross in the back of Colvin's truck and took it to a residence on Market Street. [Trial Tr. 108; Mathis testimony]. It was Funke's understanding that the home they took the cross to was the home of the man that Colvin thought was dating his ex-girlfriend. [Trial Tr. 53; Funke testimony]. Before the three left Colvin's house, Colvin returned to get his gun. [Trial Tr. 113; Mathis testimony]. Mathis, Funke, and Colvin carried the cross over to the house. [Trial Tr. 111; Mathis testimony]. When they carried the cross over to the man's house there was a handgun and an assault rifle in Colvin's truck. [Trial Tr. 56; Funke testimony]. Funke and Mathis planted the cross in a hole Funke had dug and ignited the cross. [Trial Tr. 112; Mathis testimony]. Funke borrowed a handgun from Colvin, telling Colvin he would shoot if someone came out. [Trial Tr. 62; Funke testimony; Trial Tr. 116; Mathis testimony]. Colvin sat in the truck at the back of the house. [Trial Tr. 61-62; Funke testimony]. Then Funke picked up a rock and threw it at the house, ran back to the truck and returned to Colvin's house. [Trial Tr. 63; Funke testimony].

Stacey testified that he and Funke has burned a cross on September 30, 1996 and that Colvin and Funke discussed burning more crosses to make the FBI believe they had the wrong people when investigating the September 30, 1996 cross-burning. [Trial Tr. 165-66].

Colvin did not testify at trial.

5

*Colvin's Ineffective Assistance Claim*. Colvin argues that his attorneys should have presented certain witnesses who would have contradicted the trial testimony of Funke, Mathis and Stacey and others. On the eve of trial, Colvin's attorneys learned the Government had interviewed witnesses whose statements were contradictory to other witness statements.

First, Colvin argues that KKK leaders Jeffrey and Anthony Berry told government agents that the Klan had not sanctioned any cross-burnings in Kokomo Indiana, contrary to Funke's testimony that he received permission for the first cross-burning and Colvin received permission for the second burning from the Imperial Wizard.

Colvin next argues that Jennifer Gordon ("Gordon"), a witness interviewed by the prosecution, would have provided testimony that contradicted the story told by Funke, Stacey and Mathis. Gordon testified at the evidentiary hearing on Colvin's Section 2255 motion that Funke, Stacey, and Mathis came to Colvin's home one evening in October boasting about burning a cross. According to Gordon, Colvin ordered the three to leave his house when this happened. Colvin argues that this contradicts the story told by all three because each claimed that only Funke and Stacey committed the first cross-burning and that Stacey had no involvement in the second. He further argues that this testimony contradicts Mathis' claim that he was a reluctant participant. Colvin also argues that Gordon's description of Colvin's reaction would have presented evidence that Colvin was the person who wanted no part of these cross-burnings.

Third, Deann Eldridge ("Eldridge") testified at the evidentiary hearing that Funke tried to implicate her in the first cross-burning by putting the shovel and gas can he used on Eldridge's porch. She also testified that Funke told her that he would implicate another person, John Clark, in the cross-burnings to keep law enforcement from discovering his involvement. Colvin argues that if Eldridge had testified at trial, her testimony would have given the jury evidence that

6

Funke sought to implicate innocent people in the cross-burnings within minutes of burning the first cross. Eldridge also testified at the evidentiary hearing that Mathis made calls to Jeffrey Berry on her telephone. Colvin argues that this omitted testimony combined with Gordon's omitted testimony shows Mathis as a boastful participant, instead of being an unwilling participant in the cross-burnings, as he testified at Colvin's trial.

Finally, Mathis testified at the evidentiary hearing that Funke and Mathis had a connection to the Ortiz house. Funke pointed the Ortiz house out to Mathis because of the Puerto Rican flag and expressed racial prejudice. Colvin argues that this testimony about Funke's reaction to the Puerto Rican flag would have suggested that Funke had a motive to do a cross-burning at this house which was completely unconnected to Colvin and would have linked Mathis to the second cross-burning. Colvin asserts that this testimony would have provided the jury with an alternative theory of why the Ortiz family became the victim of Funke and Mathis' racially motivated acts of intimidation.

For their part, Colvin's attorneys testified at the evidentiary hearing on Colvin's Section 2255 Motion that they do not specifically remember Colvin giving them information that would suggest an alibi defense. [Evid. Hrg. Tr. 33-34; Raquet testimony; Evid. Hrg. Tr. 53, 58; Rosselot testimony]. Both also testified that they would have acted on such information if he had given it. [Evid. Hrg. Tr. 34; Raquet testimony; Evid. Hrg. Tr. 59; Rosselot testimony]. If Colvin had said he was with Jennifer Gordon the evening of the cross-burning, Raquet would explored that information. [Evid. Hrg. Tr. 34.] Raquet also testified that he did not call Jeffery Berry as a witness because he did not know what he would say. [Evid. Hrg. Tr. 35-36]. Colvin did not testify at the evidentiary hearing.

7

*Performance.* Colvin has not shown that his trial counsel's decision not to present the testimony he believes should have been presented constituted deficient performance.

First, Colvin did not indicate to his counsel that an alibi defense might be possible. Trial counsel conferred with Colvin prior to trial, and testified that based on their experience and practice, they would have investigated any alibi or exculpatory information and would have interviewed any witnesses that Colvin identified as helpful to his defense. It is undisputed that Colvin never communicated to his counsel that he had an alibi, so it was not unreasonable for counsel not to seek witnesses or other evidence supporting an alibi.

Next, counsel testified at the evidentiary hearing that they did not subpoena Jeffrey Berry as a witness because they felt his testimony would have been unreliable. Raquet explained that he did not know what Mr. Berry would testify to at trial. [Evid. Hearing Tr. 31-32].

Next, Gordon's testimony would have provided little, if any, value to Colvin's defense. Gordon testified at the evidentiary hearing that Funke, Stacey, and Mathis came to Colvin's home one evening in October boasting about burning a cross. According to Gordon, Colvin ordered the three to leave his house when this happened. Colvin argues that this contradicts the story told by all three because each claimed that only Funke and Stacey committed the first cross-burning, and that Stacey had no involvement in the second. Gordon's testimony about the boasting contradicts Mathis' claim that he was a reluctant participant. Colvin also argues that Gordon's description of Colvin's reaction would have presented evidence that it was Colvin who wanted no part of these cross-burnings. While this testimony might have contradicted testimony at trial, it would not have provided Colvin with an alibi. Gordon could provide no specific date when the incident she described occurred.

In addition, Eldridge's proposed testimony was not significant. Eldridge's testimony was simply that Funke attempted to implicate others in the cross-burning of September 30, 1996. Her testimony would not have supplied Colvin with an alibi or any exculpatory evidence.

Finally, Mathis' testimony at the evidentiary hearing that Funke also provided a connection to the victim's house before the cross-burning is not crucial to Colvin's defense. While it might have provided another connection to the victim's house, it does not dispute the evidence that Colvin targeted the victim because he thought that person was dating his ex-girlfriend.

*Prejudice*. Even if counsel's performance were deficient, Colvin suffered no prejudice. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Strickland*, 466 U.S. at 693. "[T]he reviewing court must consider all the evidence–the good and the bad–when evaluating prejudice." *Wong v. Belmontes*, 130 S. Ct. 383, 390 (2009). Colvin has not established that there is a reasonable probability that, but for the alleged errors, the result of the proceeding would have been different. This is evident from the strong weight of the government's case. *See Rios v. Rocha*, 299 F.3d 796, 808-809 (9th Cir. 2002) (prejudice based on a failure to investigate witnesses "must be considered in light of the strength of the government's case.") (citation and internal quotations omitted).

The government's case included testimony from Funke and Mathis, Colvin's two co-conspirators, describing the events and placing Colvin at the scene of the cross-burning. Funke and Mathis testified to the same events. Each testified that Colvin chose the victim of the cross-burning, that the cross itself was built at his home, that he drove the three of them to the victim's

9

home, and that he provided his personal firearms to take on the cross-burning. The jury was able to observe these witnesses, consider the cross-examination, which included their plea deals with the government, and make a determination of their credibility. The evidence at trial also included testimony that Colvin discussed potential cross-burnings with others. Again, the jury was able to consider the credibility of this evidence in reaching its verdict. Based on the strength of the evidence that was presented at Colvin's trial, the Court does not find that he was prejudiced by his counsel's failure to interview and present certain other witnesses.

**D. Conclusion**

"The test for ineffectiveness is not whether counsel could have done more; perfection is not required. Nor is the test whether the best criminal defense attorneys might have done more. Instead the test is…whether what [counsel] did was within the 'wide range of reasonable professional assistance.'" *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir. 1995) (en banc) (quoting *Strickland*, 466 U.S. at 689). It was explained in *Holman v. Gilmore*, 126 F.3d 876, 882 (7th Cir. 1997), that:

> [t]he question posed by *Strickland* [is] whether, taking all of the proceedings into account, counsel made "the adversarial testing process work in the particular case." [*Strickland,*] 466 U.S. at 690. Counsel must contest the prosecution's case and advance a good defense; if that role has been fulfilled, a writ of habeas corpus should not issue. *See Burris v. Parke,* 116 F.3d 256 (7th Cir. 1997).

Colvin's attorneys at trial fulfilled this role. Accordingly, Colvin is not entitled to relief in this action and his motion for relief pursuant to Section 2255 is **DENIED**, and this action must be **DISMISSED** with prejudice. Judgment consistent with this Entry shall now issue.

**II.**

Pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the Rules Governing § 2255 proceedings, and 28 U.S.C. § 2253(c), the Court finds that Colvin has failed to

show that reasonable jurists would find this Court's "assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). The court therefore **DENIES** a certificate of appealability.

**IT IS SO ORDERED**.

Date: 03/31/2011

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Gerald A. Coraz
gerald.coraz@usdoj.gov

Brent Westerfeld
bwesterfeld@wkelaw.com

Charles Goodloe, Jr
charles.goodloe@usdoj.gov

William Lance McCoskey
william.mccoskey@usdoj.gov